IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **GERARD JOSE NAVARRO PARRA**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. **3:24-cv-1290-L** |
| | § | |
| **MARIA FERNANDA VILLALONGA** | § | |
| **CAMARGO,** | § | |
| | § | |
| Respondent. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court is Petitioner Gerard Jose Navarro Parra's ("Mr. Navarro Parra" or "Petitioner") Petition for Return of Child Pursuant to the Hague Convention ("Petition") (Doc. 1), filed May 28, 2024. The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure[1] following a bench trial held on November 19-20, 2024, at which Petitioner and Respondent Maria Fernanda Villalonga Camargo ("Ms. Villalonga Camargo" or "Respondent") were represented by counsel. For the reasons that follow, the court **grants** the Petition for Return of Child Pursuant to the Hague Convention and **orders** that the child, G.N.V., be **returned** forthwith to Chile to the custody of her father, Petitioner Gerard Navarro Parra.

---

[1] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *Id.* The court instead has limited its discussion to those legal and factual issues that form the bases of its decision.

**Memorandum Opinion and Order – 1**

## I.    Procedural Background

This case involves the alleged wrongful removal or retention of a child under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc., No. 99-11, which is implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003 *et seq*. Petitioner brought this action on May 28, 2024, requesting that the court order the return of their daughter, G.N.V. and related relief pursuant to the Hague Convention. In his Petition, Mr. Navarro Parra contends that he and Respondent, his former girlfriend, are the parents of G.N.V. and that Respondent wrongfully removed or retained G.N.V. in the United States in July 2023. He alleges that G.N.V. has been a habitual resident of Chile continuously since her birth in 2019. Further, he contends that Ms. Villalonga Camargo violated their agreement when she removed G.N.V. from her habitual residence in Chile and permanently relocated to the United States.

Mr. Navarro Parra seeks an order requiring: (1) Ms. Villalonga Camargo to immediately return G.N.V. to Chile at Respondent's cost; (2) that Respondent immediately deliver his daughter, G.N.V., to the physical custody of the United States Marshal or other law enforcement officers, along with airplane tickets for his child's return to Chile; and (3) provide court instructions that the United States Marshal or other law enforcement officers take such steps as are reasonably necessary to cause the return of the child to the custody of the Petitioner father in Chile. According to Mr. Navarro Parra, as G.N.V.'s natural father, he has custody rights over her under the laws of Chile, which he exercised at all relevant times.

On November 19-20, 2024, the court conducted a bench trial regarding Mr. Navarro Parra's Petition under the Convention for the return of G.N.V. and Ms. Villalonga Camargo's

affirmative defense to the Petition. The court heard testimony from Mr. Navarro Parra, Ms. Villalonga Camargo, and Ms. Zenayda Camargo De Villalonga ("Ms. Camargo De Villalonga"), all of whom spoke with the assistance of several Spanish-speaking interpreters.[2] In addition to witness testimony, the parties presented documentary evidence and arguments during the bench trial through their counsel, and Petitioner and Respondent filed pretrial briefs in support of their positions.

The facts contained herein are either undisputed, or the court has made the findings based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including the relationship of the witness to Petitioner or Respondent; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony. To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

---

[2] That Spanish-speaking interpreters were used, however, did not affect the court's ability to observe the demeanor of the witnesses or its ability to assess their credibility.

## II.     Findings of Fact

### A.  Witness Credibility and Weight Given to Testimony

During the course of the bench trial, the court had the opportunity to observe at length the demeanor of the witnesses and assess their credibility. Mr. Navarro Parra was the first witness to testify, called in Petitioner's case-in-chief.[3] He provided extensive testimony regarding his relationship with Respondent and the events that transpired after G.N.V.'s birth until the trial. Much of his testimony was inconsistent. On several occasions, the answers he gave on direct examination conflicted with the answers that he gave during his cross-examination.

Overall, Petitioner's demeanor was calm and, at times, phlegmatic. He was unable to recall specific events or provide detailed facts regarding significant events—even those events in which the record clearly established they had occurred—in response to questions on direct and cross-examination. Many of his responses were inconsistent or nonresponsive to the question asked, whether the question was posed by counsel or the court. His inability to readily answer questions posed to him and recount details causes the court to question his overall ability to recall key events. Additionally, when pressed for detailed facts, such as dates and locations of key events, he gave testimony that conflicted with his written statements to the court, which he signed under penalty of perjury.

The second witness was Ms. Villalonga Camargo, who, during her testimony, was impassioned yet serious while being examined by counsel and the court. Generally, her responses were direct to the questions asked, and she provided detailed accounts of relevant events. Ms. Villalonga Camargo was emotional during her testimony, and when she was questioned about the possibility of life without G.N.V., she became visibly overwhelmed.

---

[3] As the court noted in its November 12, 2024 order, it would permit Petitioner to testify by Zoom, and if the court's ability to assess and weigh credibility was compromised, it would document the reasons in this Memorandum Opinion and Order.

Overall, Respondent was far more credible and believable than Petitioner. She was articulate and answered questions on direct examination and cross-examination without hesitation and with specificity by providing dates and detailed testimony regarding events. As a result, the court found her version of events that transpired before and after this case was filed to be more credible and reasonable than that of Petitioner. Because the court found Respondent to be more credible, it attributed more weight to her testimony than that of Petitioner; however, unfortunately, for her, as explained herein, the law is not on her side.

Given the level of factual detail and consistency in Respondent's testimony, the court also attributed more weight to the testimony of her mother Ms. Camargo De Villalonga. She testified to her personal knowledge of the parties' relationship and the progress that G.N.V. has made since she has been in the United States. Ms. Camargo De Villalonga was passionate and informative, and at times, she was overcome with emotion during her testimony. The court found her testimony to be reliable and essential.

### B.  The Parties' Relationship and Residency in Chile

Mr. Navarro Parra is a Venezuelan citizen and a resident of Chile. Likewise, Ms. Villalonga Camargo was born in Venezuela, lived in Chile from 2016 until she moved to the United States in 2023, and is a temporary legal resident of the United States. The two met in Venezuela and were in a relationship for approximately twelve years. The parties could not agree on where to settle permanently or where they would raise G.N.V.; however, it is clear, based on Petitioner and Respondent's testimony, that they did not intend or agree to raise her in the United States. During their relationship in Chile, Respondent testified to Petitioner being unfaithful and abusive.

Petitioner and Respondent were employed while in Chile. Ms. Villalonga Camargo worked as a store clerk in Chile, and Mr. Navarro Parra worked and still works as an automobile mechanic. In Chile, Mr. Navarro Parra and Ms. Villalonga Camargo divided their apartment rent, bills, and food equally. Money for travel, clothes, shoes, and any other expenses for G.N.V. was covered exclusively by Ms. Villalonga Camargo. During her time in Chile, G.N.V. was primarily cared for by her mother, Ms. Villalonga Camargo. To ensure G.N.V. was adequately taken care of, Ms. Villalonga Camargo would take G.N.V. with her to her job. While she was at Ms. Villalonga Camargo's job, she would not interact with other children or have interactions that are normal for children her age. As a result of her parents' work schedule and concerns for her safety, G.N.V. had to go where her parents took her, which resulted in an inconsistent sleep schedule.

In Chile, G.N.V. attended daycare and school. She attended school for two months and switched to daycare because of the challenges she faced. While G.N.V. was in school, she struggled with speaking and was reluctant to interact with people, so she went to a daycare that specialized in providing speech therapy. Because of her late sleep schedule, G.N.V. would attend daycare from 1:30 p.m. to 4:00 p.m. every day, and on some occasions, she would get out at 5:30 p.m.[4] Ms. Villalonga Camargo expressed her concerns to Mr. Navarro Parra about G.N.V.'s safety at a traditional school because of the lack of security at traditional schools in Chile.

### C. The Couple's Troubled Relationship

As stated previously, Ms. Villalonga Camargo spoke about the troubles the couple was facing in their relationship, including abuse, mental and physical, infidelity, and overall concerns about the family's stability in Chile. Ms. Villalonga Camargo testified that one night, Mr. Navarro Parra asked to meet with her to have a conversation about their relationship, but after

---

[4] Mr. Navarro Parra, however, testified that G.N.V. attended daycare from 8:00 a.m. to 1:00 p.m. each day.

**Memorandum Opinion and Order – 6**

she refused to allow him to "go through" her phone, he became "very aggressive," and he began calling her a "whore" and various other names. She attested that he grabbed her very tightly, after which she became angry, and the two "ended up with blows or fighting," which resulted in her finger being fractured.

### D. Respondent's Retention of G.N.V. in the United States

The original agreement was for Ms. Villalonga Camargo and G.N.V. to visit their relatives in the United States from May 2 through May 28, 2023, and later the agreement was amended to extend the visit for two more months. During a text conversation between the parties, Ms. Villalonga Camargo informed Mr. Navarro Parra that she planned to return to Chile in July 2023. Despite this promise, on July 6, 2023, Ms. Villalonga Camargo informed Mr. Navarro Parra that she did not intend to return to Chile.

In a subsequent WhatsApp message conversation, Ms. Villalonga Camargo explained to Mr. Navarro Parra that she thought returning to Chile would be risky because she was not a permanent resident of Chile and had been in the United States for over two months. She also said, "I really feel bad with all of this. I am really clear, and I understand how you feel because I KNOW what your daughter means to you." Pet.'s Ex. 9. She told him, "I never ask [sic] your authorization with another intention. Never. Please understand that." *Id.* Ms. Villalonga Camargo further explained that she "really offered you options to come here, but all were denied by you. And I also understand that they were denied because you don't want to live here. But what am I doing in Chile? That is what I want you to understand!" *Id.* She said, "I feel like my life in Chile goes away doing nothing, working in shifts for nothing. What do I do then? I know you are hating me, and I ask your forgiveness, but what am I doing in Chile?" *Id.* G.N.V. has remained in the United States since May 2023 despite the agreement between the parties.

E.  **Respondent and G.N.V.'s Residence in the United States**

When Respondent and G.N.V. first arrived in the United States, they stayed with Respondent's Mother, Ms. Camargo de Villalonga, in Addison, Texas, and have remained with her since. G.N.V. attends George Herbert Walker Bush Elementary School. Ms. Villalonga Camargo picks her up from school daily, and when she does not, Ms. Camargo De Villalonga picks her up from school, and they "go along singing" on their way home. Since attending George H.W. Bush Elementary School, G.N.V. has made significant improvements. She is able to hold normal conversations with her classmates and her cousin, who also lives in Dallas. Ms. Villalonga Camargo stated that G.N.V. often says that she is happy, and Ms. Villalonga Camargo testified that G.N.V. is "well cared for." Trial Tr., Vol. 2 at 57:2. She further stated that G.N.V. has an excellent routine and is never by herself.

As for G.N.V.'s legal residency, Respondent has begun the process of requesting asylum for herself and G.N.V. She testified that the two are not able to travel outside of the United States because they will not be permitted to return.

## III.  **Conclusions of Law**

### A.  **Overview of Law Applicable to Wrongful Removal or Retention Cases**

The Convention was adopted to address the problem of international child abductions in connection with domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The purpose of the Convention is to "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.* (quoting Convention, art. 1). The Convention is implemented through the ICARA. *Id.* Under the ICARA, state courts and federal district courts have concurrent original jurisdiction over actions arising

under the Convention. 22 U.S.C. § 9003(a). A person, who seeks the return of a child wrongfully removed or retained may file a petition for relief "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *Id.* § 9003(b). It is undisputed that G.N.V. was located in Dallas County, Texas, when Mr. Navarro Parra filed his Petition under the Convention. The court therefore has jurisdiction over this action. The Federal Rules of Evidence apply to wrongful removal and retention cases brought under the Convention. *Martinez Dona v. Perez Castilblanco*, No. 3:17-CV-2469-L, 2018 WL 928976, at *3 (N.D. Tex. Feb. 16, 2018) (citation omitted). Authentication requirements, however, are relaxed. *See* 22 U.S.C. § 9005.

"The return remedy is the central operating feature of the Convention and provides that a wrongfully removed child must be returned to his or her country of habitual residence unless certain defenses apply." *Hernandez v. Garci Pena*, 820 F.3d 782, 786 (5th Cir. 2016) (footnote omitted). The return remedy does not address an underlying custody dispute but instead makes a determination as to where a custody decision should be made. *Id.* Therefore, it is irrelevant under the Convention "whether there is a custody dispute concerning [the] child pending at the time of removal." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004). The Convention's return remedy does not change custody rights that existed prior to the wrongful removal of a child and is not a determination regarding the merits of any custody issue. *See Abbott*, 560 U.S. at 9 (citing Convention, art. 19). As the core principle of the Convention, the return remedy works to "restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court." *Id.* (quoting *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

When a child less than sixteen years of age has been wrongfully removed or retained, and less than one year has elapsed between the alleged wrongful removal or retention and the commencement of return proceedings, the court in the country to which the child has been brought must "order the return of the child forthwith," unless one of the Convention's limited exceptions apply. *Abbott*, 560 U.S. at 9; 51 Fed. Reg. at 10507. Even when return proceedings are initiated after the expiration of one year, Article 12 of the Convention requires return of the child unless it is shown that the child is settled in his or her new environment. *Id.* If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, the burden shifts to the respondent to prove an applicable affirmative defense. *See* 22 U.S.C. § 9003(e)(1). Accordingly, if Petitioner proves his prima facie case, the court must order G.N.V. to be returned to Chile unless it determines that one of the Convention's limited affirmative defenses applies.

### B.    Petitioner's Burden of Proof

To establish a claim for wrongful removal or retention under the Convention, the petitioner must establish by a preponderance of the evidence the following three elements: (1) that "the respondent removed or retained the child somewhere other than the child's habitual residence;" (2) that the removal or retention was wrongful in violation of the petitioner's custody rights; and (3) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012).

Neither the Convention nor ICARA defines "habitual residence." *See id.* at 310. Finding the habitual residence of the child presents a mixed question of fact and law. *Monasky v. Taglieri*, 589 U.S. 68, 83 (2020). A petitioner must establish the child's habitual residence

through the totality of the circumstances. *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) (citing *Monasky*, 589 U.S. at 84). Once established, the court must apply that legal standard to the relevant facts to "determine if the child was at home in the country from which the child was removed." *Id*. A child's presence in a country is deemed "habitual" when her "residence there is more than transitory." *Id*. at 562. Additionally, courts may consider the parents' citizenship and location of any owner property, the parents' shared intention to raise the child in a location prior to removal, the place of residence when the child was born, location of the child prior to removal, and any formal custody agreement between them. *See Smith*, 976 F.3d at 563 (citing *Monasky*, 589 U.S. at 84).

A parent's removal or retention of a child is considered wrongful "when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights." *Sealed Appellant*, 394 F.3d at 343 (citing Convention, art. 3). "[R]ights of custody" are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)). Pursuant to Article 3 of the Convention, "rights of custody" may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement. Convention, art. 3.

When no formal custody agreement exists between the child's parents, courts must apply the laws of the country of the child's habitual residence to determine whether the nonremoving parent had "rights of custody" within the meaning of the Convention. *Appellant*, 394 F.3d at 343. "Article 14 of the [Hague] Convention authorizes the court to take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof

of foreign law." *Martinez Dona v. Perez Castilblanco*, No. 3:17-cv-02469-L, 2018 WL 928976, at *7 (N.D. Tex. Feb. 16, 2018). Here, the parties do not have a formal custody agreement; therefore, the court will apply the laws of G.N.V.'s habitual residence to determine whether Petitioner had rights of custody under the Convention.

To determine whether a petitioner was exercising those parental rights at the time of removal, a court considers the petitioner's conduct at the time of removal or retention. *Larbie*, 423 F.3d at 308 (internal quotation removed). "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Sealed Appellant*, 394 F.3d at 345 (internal quotation omitted).

### C.    Respondent's Burden of Proof

If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, the burden shifts to the respondent to prove an applicable affirmative defense. *See* 22 U.S.C. § 9003(e)(1). Even if the child has been wrongfully removed, return is not required if the removing parent can establish that an exception under the Convention applies. *Abbott*, 560 U.S. at 22. The Convention provides several narrow affirmative defenses if a respondent "opposes the return of the child." Convention, arts. 12, 13, 20; 22 U.S.C. 9003(e)(2). Specifically, a respondent may argue that: (1) return of the child would subject the child to a grave risk of harm; (2) return would violate the fundamental principles of the returning country; (3) this proceeding was initiated more than one year after removal and the child is now well-settled in the new environment; (4) the child has sufficient maturity and objects to the return; and

(5) the petitioner has consented or acquiesced to the removal. *Id*. Respondent has asserted only one affirmative defense, grave risk of harm, which the court will address in full.

A respondent may show by clear and convincing evidence[5] that there is a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. 9003(e)(2)(A). The level of harm necessary to trigger the Article 13(b) exception must be "a great deal more than minimal." *Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) (citation omitted). The grave risk defense applies to situations where the risk to the child is "grave, not merely serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (March 26, 1986). A grave risk or intolerable situation also exists when returning a child would send him or her "to a zone of war, famine, or disease, or in cases of serious abuse or neglect." *Vazquez v. Estrada*, No. 3:10-CV-2519-BF, 2011 WL 196164, *5 (N.D. Tex. Jan. 19, 2011). The exceptions to return of the child look for prospective risk, not retrospective. *Sanchez*, 761 F.3d at 509.

Evidence of prior abuse is insufficient, especially when there is conflicting testimony about the alleged abuse. *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at *5 (S.D. Tex. Aug. 17, 2010). Allegations of spousal abuse are only relevant if the abuse seriously endangers the child. *Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *9 (S.D. Tex. Sept. 28, 2016), *aff'd*, 694 F. App'x 957 (5th Cir. 2017). Where the respondent demonstrates a sustained

---

[5] Civil cases are typically decided by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-88 (1983). Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely than not. *Id.* at 390. Thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that his or her version of the facts is true. *Id.* The "clear and convincing evidence standard" is "higher than the preponderance of the evidence standard, common in civil cases, but not as high as beyond a reasonable doubt." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation and internal quotation marks omitted); *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). "Clear and convincing evidence" means evidence "so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 395, n.9 (5th Cir. 2004) (quoting *Travelhost, Inc.*, 68 F.3d at 961) (internal quotation marks omitted).

pattern of physical abuse or propensity for violence, particularly if observed by the child, the court may find a grave risk. *Id*. "In contrast, sporadic and isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found not to constitute a grave risk." *Id*. (internal quotes and citations removed). Isolated allegations of harm are more suspect when disputed by the parties. *Id*. Further, when the parents' current living situation makes cohabitation unlikely and therefore recurring spousal abuse witnessed by the child unlikely, there is no grave risk of harm. *Sierra*, 2016 WL 5402933, at *9 (internal citation omitted).

## IV.    Application of Law to Facts

### A.    Petitioner's Prima Facie Case

#### 1.    Habitual Residence

The evidence in this case leads the court to conclude that G.N.V.'s habitual residence is Chile. She was born in Chile, and prior to her removal to the United States, she had only resided in Chile since birth. Her father is a Venezuelan citizen whose family resides in Venezuela and Chile. Ms. Villalonga Camargo also has family in Venezuela and prior to her move to the United States, her mother lived in Chile. G.N.V. attended a school and daycare in Viña del Mar, Chile. While the parties contemplated making a life together someplace outside of Chile, that discussion did not come into fruition before G.N.V.'s removal, which is the point in time that the court considers when determining the habitual residence issue.

Based on the foregoing, the court determines that Petitioner and Respondent shared an intent or settled purpose that G.N.V.'s habitual residence would be Chile. Respondent's removal of G.N.V. from Chile and retention of her in the United States does not affect the court's resolution of this issue because Respondent's unilateral actions in this regard are insufficient to

establish an intent to change G.N.V.'s habitual residence. Moreover, as herein discussed, there is no credible evidence to support Ms. Villalonga Camargo's generalized assertions of sexual abuse and illegal conduct relating to adolescents in Chile. For all of these reasons, the court concludes that G.N.V.'s habitual residence is in Chile. Petitioner has, therefore, satisfied this element.

　　　　2.　Wrongful Removal and Retention

Here, the parties do not have a formal custody agreement. Because there is no agreement, the court will consider whether Petitioner had rights of custody under the Convention. The laws that govern the rights of personal care standards in Chile are found in Articles 224, 225, and 229 of the Chilean Civil Code. The court, pursuant to Federal Rule of Evidence 201, takes judicial notice of Articles 224, 225, and 229 as permitted by Article 14 of the Convention. Judicial notice of foreign law is appropriate in cases arising under the Convention. Convention, art. 14 (providing that to determine "whether there has been a wrongful removal . . . the judicial . . . authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child . . . .")

Article 224 of the Chilean Civil Code provides that "[i]t is the responsibility of the parents . . . to take personal care of their children." The Article further states that "[t]his will be based on the principle of co-responsibility, by virtue of which both parents, living together or separately, will participate actively, equitably and permanently in the upbringing and education of their children." Article 225 of the Chilean Civil Code provides that "[i]n the absence of the agreement of the first paragraph, the children will continue under the personal care of the father or mother with whom they are living." *Id.* Article 225-2 of the Chilean Code lists the following factors to be taken into account when considering care of Child: (1) relationship between child,

parent, and families; (2) parent's ability to guarantee child's well-being and age-appropriate surroundings; (3) contribution to child's care while under the other parent's care; (4) each parent's attitude to cooperate with one another; (5) each parent's commitment to the child before separation; (6) a child's direct expression; (7) results of any steps ordered to take; (8) agreement of parents before and during judicial process; (9) parents' residence; and (10) any other relevant factors related to the child. *Id.* (cleaned up).

Finally, Article 229 of the Chilean Civil Code provides that "[t]he father or mother who does not take personal care of the child will have the right and the duty to maintain a direct and regular relationship with [her]." *Id.* Further, the Code states that the right "will be exercised with the frequency and freedom agreed directly with the person who has [the child] on [her] behalf and care according to the conventions referred to in the first paragraph of article 225." *Id.*

Because (1) G.N.V.'s parents were not married when she was born; (2) there is no formal agreement as discussed pursuant to Article 225; and (3) she lived with both parents her entire life in Chile prior to the alleged wrongful retention, the court determines that Article 224 governs whether Mr. Navarro Parra had custodial rights pursuant to Chilean law. Petitioner is deemed to have "actively participated" in G.N.V.'s life because (1) he helped pay for expenses related to G.N.V.; (2) she lived with him until her removal; and (3) he picked her up and dropped her off at school on occasion.

While Respondent shares the same joint parental authority, she is not authorized to unilaterally decide to retain possession of G.N.V. against Petitioner's desires. Respondent's removal and retention of G.N.V. were therefore wrongful. The court, therefore, concludes that Petitioner has satisfied this element. Accordingly, the court determines that Petitioner had custodial rights under Chilean law.

**Memorandum Opinion and Order – 16**

3.  Petitioner's Exercise of Custody Rights

The evidence shows that Petitioner was exercising his custody rights prior to G.N.V.'s alleged wrongful retention under Chilean law, as previously addressed,  G.N.V. lived with Petitioner and Respondent until she was brought to the United States. Petitioner also provided financial support to Ms. Villalonga Camargo for G.N.V. Petitioner actively participated in G.N.V.'s life while she was in Chile, although less than that of her mother, and has maintained regular contact with G.N.V. while she has been in the United States. He also initiated wrongful removal proceedings in Chile and the United States. Simply put, there is no evidence that Petitioner was not exercising his "rights of custody," as that term is defined by the Convention, when Respondent wrongfully retained possession of G.N.V. and brought her to the United States. *See Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)).

Accordingly, Petitioner has satisfied this final element and his burden of establishing, by a preponderance of the evidence, that the removal or retention of G.N.V. was wrongful. The burden, therefore, shifts to Respondent to prove her "grave risk" affirmative defense by clear and convincing evidence.

**B.    Respondent's Affirmative Defense**

As stated earlier, the grave risk defense applies to situations where the risk to the child is "grave, not merely serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (March 26, 1986). Respondent must prove this exception by clear and convincing evidence. Hague Convention, art. 13(b); *see* 42 U.S.C. § 11603(e)(2)(A). Evidence of adjustment problems attending relocation and separation from a parent is inapposite to the grave risk determination. *England,* 234 F.3d at 271.

Respondent asserts that returning G.N.V. to Chile would expose her to harm by placing her in an intolerable situation where she lacks proper care and support. First, Respondent argues that G.N.V. attended Catholic daycare in Chile and "sexual abuse of children in schools and [daycare] facilities in Chile, particularly those run by the Catholic church, is well documented." Doc. 41 at 5. Second, Respondent contends that if the court orders Ms. Villalonga Camargo to return G.N.V. to Chile, she would spend a significant amount of time in these institutions due to Petitioner's rotating work schedule. Third, she argues that drug use is prevalent among school-aged children, and finally, if G.N.V. is ordered to return, she will have no family other than her father to support her. Ms. Villalonga Camargo contends that all of these things will subject G.N.V. to a high risk of harm.

In *Vazquez v. Estrada,* Civ. A. No. 3:10-CV2519, 2011 WL 196164 (N.D. Tex. Jan. 19, 2011), Magistrate Judge Stickney concluded that Respondent had established the grave risk exception by clear and convincing evidence and held the following:

> Like the other defenses, the grave risk defense must be narrowly construed. The defense was not intended to encompass situations such as the return to a home where money is in short supply or where educational opportunities are more limited. Instead, a grave risk or intolerable situation exists where return of the child would send the child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect.
> Respondent provided evidence that there has been a surge of violent activity in Monterrey due to drug cartel activity and that the neighborhood where Petitioner lives is dangerous. This is not sufficient to find that Monterrey is a "zone of war." *See Silverman,* 338 F.3d at 900-01 (finding that general regional violence in Israel does not establish a "zone of war"); *Mendez Lynch v. Mendez Lynch,* 220 F.Supp.2d 1347, 1365-66 (finding civil instability and presence of violent demonstrations in Argentina did not amount to a "grave risk" or "intolerable situation"). Respondent has failed to establish by clear and convincing evidence that a grave risk of physical harm exists.

*Id.* at *5 (some citations omitted)

Likewise, general allegations of high criminal activity, sexual abuse, and drug abuse in Chile are not sufficient to establish by clear and convincing evidence that returning G.N.V. to Chile poses a grave risk. Further, the grave risk of harm defense was not intended to be used by a respondent as a vehicle to litigate the child's best interests. Convention Analysis, 51 Fed. Reg. 10503–10516, 10510 (March 26, 1986). The Chilean court is best suited to make this determination. Accordingly, Respondent's allegations do not show by clear and convincing evidence that the harm to G.N.V. is "a great deal more than minimal." *Sanchez,* 761 F.3d at 510. The facts of this case do not rise to the level required to support a "grave risk" defense under the Convention, and the court concludes that Respondent fails to establish this affirmative defense by clear and convincing evidence.

## V.      Request for Fees and Costs

In his Petition, Petitioner requested to recover his attorney's fees and costs incurred as a result of this action. Regarding the recovery of fees and costs in wrongful removal and retention proceedings under the Convention and ICARA, article 26 of the Convention states that the court "may, where appropriate" order the removing parent to cover all legal and travel expenses of the non-removing party. *See* Convention, art. 26; *Sealed Appellant*, 394 F.3d at 346. ICARA, on the other hand, requires the court to order the removing parent to pay fees and costs incurred by the petitioner if it finds in favor of the petitioner and orders the return of the child:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall order* the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3) (emphasis added) (formerly 42 U.S.C. § 11607); *Sealed Appellant*, 394 F.3d 346.

The court cannot make a determination on the issue of attorney's fees and expenses, as the parties have not fully briefed the court on this matter. Accordingly, Petitioner shall file, within **14 days** of this Memorandum Opinion and Order, an application detailing the services rendered and expenses incurred and supporting authority for and documentation of all fees and costs requested. *See* Fed. R. Civ. P. 54(d)(2)(B)(i). Any objections or response by Respondent must be filed within **14 days** from the date of service of Petitioner's submission. Petitioner may file a reply within **7 days** from the date of service of Respondent's objections or response. Unless Respondent is able to establish that the requested award is "clearly inappropriate," the court will enter an appropriate monetary award of attorney's fees, costs, and expenses. The court reminds the parties that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

## VI.   Conclusion

For the reasons herein stated, the court **grants** the Petition for Return of Child and **orders** that the child, G.N.V., be **returned** forthwith to Chile to the custody of her father, Petitioner Gerard Navarro Parra. The court **orders** that Respondent immediately release and surrender—or cause her to be released and surrendered—G.N.V. to Petitioner. Respondent may use a trusted family member or friend to carry out this directive. In any event, G.N.V. must be returned to her father as ordered by the court.  If Respondent does not return G.N.V. to Petitioner within **fourteen** days of the filing of this Memorandum Opinion and Order, Petitioner is **ordered** to file a Motion to Enforce Judgment and Application for Clerk to Issue Writ of Attachment in which he shall detail how G.N.V. shall be returned.

**Further, neither Respondent—nor anyone acting in concert with her or on her behalf—shall take any action to interfere with or thwart the court's order. If any person**

**interferes with the court's directives herein set forth, such person will be subject to the imposition of sanctions, including, but not limited to, monetary sanctions, arrest, and possible incarceration for contempt of court.**

Finally, once G.N.V. is returned to the custody of her father, counsel for Petitioner shall inform the court forthwith **in writing**. The court **retains** jurisdiction over this action pending G.N.V.'s return to Chile to the custody of Petitioner and the resolution of any motion for attorney's fees, costs, and expenses. Judgment will be issued by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 2nd day of April, 2025.

Sam A. Lindsay
United States District Judge